UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
JILLIAN L. BROWN,                         )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )         Civil Action No. 09-2456 (PLF)
                                          )
CHILDREN'S NATIONAL MEDICAL               )
CENTER, *et al.*,                         )
                                          )
            Defendants.                   )
_____  )


<u>OPINION</u>

            This matter is before the Court on defendants' motions to dismiss.  For the

reasons discussed below, the motions will be granted in part and denied in part.


I.  BACKGROUND

            Plaintiff Jillian Brown, an African-American female, began her employment at

Children's Hospital National Medical Center ("CNMC"), Emergency Medical Services for

Children ("EMSC"), National Resource Center ("NRC"), as a temporary employee in October

2002; she became a permanent employee, an Office Coordinator, in April 2003.  Compl. at 8-9.

Among NRC's employees were plaintiff's direct supervisor, Edward Liao, *id.* at 9, Theresa

Morrison-Quintana, Partnership Outreach Team Leader, *see id.* at 2, Susan Eads Role, Director

of Partnerships and Public Policy, *id.* at 3, Jocelyn Hulbert, State Partnership Outreach

Coordinator, *id.* at 2, 10, and Kenneth Allen, *id.* at 5, Director of Program Planning and Training,

*id.* at 22, to whom Morrison-Quintana and Hulbert reported, *id.* at 12.[1]  After Liao resigned in

July 2006, plaintiff assumed certain of his duties, including supervision of two Administrative

Assistants, Patricia Thompson and Nanette Pierre, both African American.  *Id.* at 7-8.  Plaintiff

then reported directly to the NRC's Executive Director, Dr. Jane Ball.  *Id.* at 9, 21.

       In the fall of 2006, Dr. Ball announced her retirement effective at the end of that

year.  Compl. at 10.  According to plaintiff, Role and Allen "began pressuring [plaintiff] to join,

and later lead, a committee to align itself against Dr. Ball."  *Id.*  Specifically, Role and Allen

intended to coerce Dr. Ball either to appoint one of them as the new Executive Director, or to

appoint both as Co-Directors, by threatening to accuse Dr. Ball of misappropriating federal

funds.  *Id.*  In furtherance of the plot, Role and Allen allegedly sought to obtain plaintiff's

signature on a statement attesting to false allegations against Dr. Ball.  *Id.*  Plaintiff refused, and

instead reported these events to Kathryn Koepenick, the NRC's Senior Human Resources

Consultant, in October 2006.  *Id.*  Apparently there was an investigation into Dr. Ball's activities,

and in November 2006 she was "found . . . innocent."  *Id.*  During the last week of December

2006, Dr. Ball allegedly warned plaintiff that she and Hulbert should "keep a low profile"

because Allen had them "on his radar."  *Id*.  Dr. Ball allegedly shared her concerns with Tasmeen

Singh, who became NRC's Executive Director as of January 1, 2007.  *Id.*

       On January 3, 2007, Singh requested a meeting with plaintiff to discuss

"accusations made against [her] by 'many/several staff.'"  Compl. at 12.  Plaintiff was accused of

having said that Hulbert earned more than Morrison-Quintana, having forced Morrison-Quintana

---

[1]     Plaintiff has named Theresa Morrison-Quintana and Jocelyn Hulbert as
defendants, as well as CNMC, Kathryn Kozpenick, and Tasmeen Singh.

to adjust her telecommuting schedule, and having behaved rudely to others because she was dissatisfied with her job. *Id.* According to plaintiff, the events giving rise to these complaints occurred several years earlier, *see id.* at 8; yet none had been raised with prior management because plaintiff "was supposedly viewed as 'intimidating and physically intimidating' and a 'favorite' of [Dr.] Ball." *Id.* During this meeting, Singh "made comments that made it obvious that she was aware [plaintiff] had filed a charge of discrimination against a former employer alleging racial discrimination." *Id.* at 37. When plaintiff asked who had made complaints against her, Singh responded that the complainant was Thompson, one of the administrative assistants whom plaintiff supervised; other staff members allegedly confirmed Thompson's assertions. *Id.* at 12. Plaintiff later learned that Morrison-Quintana was her principal accuser. *See id.* at 3, 14, 19.

Believing that "Dr. Ball's fears were coming to fruition far sooner than [she] expected," on January 4, 2007, plaintiff called Hulbert to ask whether anyone had asked her questions about plaintiff. Compl. at 13. Hulbert responded that, prior to January 3, 2007, Singh "solicited feedback from her [about plaintiff]," and Hulbert had repeated "what she had heard" from others. *Id.* Plaintiff allegedly warned Hulbert "to be careful because Dr. Ball . . . had the same fears regarding . . . Hulbert." *Id.*

On January 5, 2007, Singh and Koepenick informed plaintiff that she would be suspended "for 'bullying and intimidating'" Hulbert. Compl. at 13. Singh stated that "several employees made allegations against [plaintiff]," and because "too many [were] saying the exact same thing . . . an investigation would be conducted." *Id.* Plaintiff believed that "she was being subjected to a hostile work environment because one, or 'many/several' employees were making

false allegations against her, the fabricated allegations were only supported by gossip and

hearsay," and that no one had any "intention of interviewing, question[ing] or speaking with [her]

to hear her side of the story." *Id.*  Rather, plaintiff "was already considered to be guilty of the

allegations," *id.*, and indeed was found "guilty of the allegations, additional transgressions,

and . . . was rude, had communication issues, was a bully, intimidating, physically intimidating,

confrontational, participates in unprofessional gossip discussions, and was retaliatory." *Id.* at 14.

On January 11, 2007, plaintiff reported to the NRC "to learn of . . . the

investigative findings." Compl. at 14.  On that date, Singh issued a Final Written Notice to

plaintiff, *id.*, which in relevant part stated:

> [T]he notice is being issued because of concerns having to do with
> 1. intimidating conduct at the work place and 2. inappropriate
> communications of confidential information and 3. inappropriate
> conversations regarding other employees.  As your manager, I have
> learned about this behavior through my investigation and through
> unsolicited complaints.
>
> In response to these concerns and complaints, I spoke to you on
> January 3, 2007 to allow you the opportunity to respond and present
> your perspective.  At the conclusion of this conversation I directed
> you not to have any conversations regarding our meeting with any
> staff member.  However, the next morning it was brought to my
> attention that you called a staff member directly to ask if that
> individual had spoken to me regarding your performance and made
> comments to that individual about her own job security.  As a result
> of this retaliatory and intimidating behavior, the decision was made
> to immediately remove you from the workplace by initiating a
> suspension pending the completion of the investigation.  As part of
> that process, we gave you an opportunity to respond to the complaints
> made against you.
>
> At this time, I have formally recommended that we lift the suspension
> so you can return to work.  This notice is to provide you with clear
> expectations of the sorts of behaviors that are and are not permitted
> [, and plaintiff was instructed to] refrain from:

1. Conversations with employees about any NRC employee's salary (including your own) or budget information or any other sensitive employment or contract information.

2. Unprofessional "gossip" such as discussions about who might get fired or warning employees that they are "next to go" or acting in other ways that lend themselves to a hostile work environment for those around you.

3. Making inappropriate remarks to co-workers regarding the reasonableness of compensation for NRC staff, the qualifications of employees for their pay grade and job duties, or the productivity of co-workers.

4. Being confrontational and/or intimidating in your demeanor including the use of an unusually loud tone or the use of physical gestures that may reasonably be construed as intimidating to any employee.

5. Retaliatory conduct against other employees who may have brought concerns about your conduct to the manager. This includes harassing dialogue with employees such as asking them directly whether they complained, engaging in conversations with any employee about what was said or the terms of the suspension or this final notice, or any other conversations related to the complaints brought against you.

\* \* \*

It is expected that you demonstrate cooperative, courteous and professional behavior at all times. Any incidents of not responding to requests in a reasonable timeframe, or any other inappropriate actions/inaction or problematic communication is also not acceptable behavior under the terms of this notice.

While it is my sincere intention to work with you in good faith to overcome these performance issues, I need to be absolutely clear that failure to follow the instructions above, engagement in any form of retaliation or any continued performance problem will result in your immediate termination.

Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss [Dkt. #9] ("Pl.'s First Opp'n"), Ex. F (Final

Written Notice) at 1-2 (emphasis added).[2]

On January 16, 2007, plaintiff "filed a complaint with the EEOC and copied . . .

Singh, . . . Koepenick and the Human Resources Department on the complaint." Compl. at 25;

*see id.* at 16, 33. The complaint took the form of correspondence to the Washington Field Office

of the Equal Employment Opportunity Commission ("EEOC"). Pl.'s First Opp'n, Ex. J (Letters

from plaintiff to EEOC dated January 15, 2007). After describing at length her suspension and

the Final Written Notice, plaintiff requested that the EEOC "review [her] submission and . . .

investigate this tangible employment action, discrimination/disparate treatment, retaliation,

harassment, and hostile work environment." *Id.*, Ex. J at J2 (page number designated by

plaintiff). Plaintiff submitted an additional letter to the EEOC. *See id.*, Ex. K (Letter from

plaintiff to Hal Budnick, Intake Officer, Washington Field Office, EEOC, dated May 11, 2007).

The outcome of this exchange is not clear.

After these events, plaintiff allegedly no longer received group e-mail messages,

was not notified of mandatory training, was denied access to CNMC's personnel policies and

was prevented "from utilizing CNMC's Employee Complaint process to file internal grievances."

Compl. at 24. Her workload was increased to include the taking of meeting minutes (previously

a task assigned to an employee at a lower grade), making photocopies, and covering the front

---

[2]     Singh allegedly "made comments that made it obvious that she was aware that
[plaintiff] filed a charge of discrimination against a former employer alleging racial
discrimination." Compl. at 37. These comments may have been made either at the meeting
during which the Final Written Notice was issued or at the time plaintiff was notified of her
termination. According to plaintiff, both the disciplinary actions taken against her and her
termination by RIF were "directly related to her prior protected activity." *Id.*

desk when the receptionist was not available, while in other respects she was "stripped . . . of her duties." *Id.* at 25. For example, plaintiff no longer was responsible for processing and reconciling check and travel requests, *id.* at 6, was denied access to files containing budget information, *id.* at 8, was denied a master key which would have given plaintiff access to other employees' offices, *id.*, and otherwise was "held up to all as an employee who could not be trusted with keys, files, [and] confidential information[.]" *Id.* at 22. Singh allegedly "monitored and questioned [her] every move, evaluated and reevaluated every task [she] performed, micromanaged . . ., marginalized [her] within the department, effectively demoted [her] and [became] an oppressive presence in [her] work environment." *Id.* at 25.

Plaintiff took particular exception to the conditions set forth in the Final Written Notice directing her to refrain from using a tone of voice or physical gestures that reasonably could be construed as intimidating to any employee. In her view, this provision allowed her coworkers "to construe [her] movements in any way that they saw fit," and the terms "were meant to humiliate [her] and to place her in a subservient position to her Caucasian coworkers." Compl. at 17. She believed that she "was prohibited from using body language," and [e]ven though communication is more nonverbal than verbal, [she] faced immediate termination if it were construed that she used any body language." *Id.* at 26. She was "in constant fear of losing her job because the language of the Final Written Notice was so subjective that . . . any employee could . . . accuse [her] of 'being confrontational and/or intimidating in [her] demeanor[.]'" *Id.* In addition, according to plaintiff, Singh, Koepenick and some of plaintiff's co-workers allegedly "used stereotypes," describing her "as the loud black woman who rolls her eyes, was angry,

physically intimidated everyone, used body language, was a bully and had a problem communicating." *Id.* at 16.

Plaintiff's employment came to an end on March 5, 2007, at which time Singh and Koepenick informed her that, "[a]s a result of an internal evaluation of the administrative personnel needs at the [NRC], the position of Office Coordinator [was] being eliminated." Compl. at 17. Pursuant to a reduction in force ("RIF"), four employees were terminated, three African American (plaintiff, Thompson and Pierre) and one Caucasian. *Id.* at 3, 18. Three new administrative positions were created, and the position of Staff Assistant "would assume all of the prior responsibilities" of plaintiff and the two terminated African-American Administrative Assistants. *Id.* According to plaintiff, NRC merely terminated her, changed the position title, and transferred her responsibilities to a newly titled position, such that she "was terminated via a pretextual RIF." *Id.* Plaintiff deemed her termination by RIF the culmination of a series of "numerous negative tangible employment actions," Compl. at 19, designed to accomplish what otherwise could not have occurred under the prevailing law. Pl.'s First Opp'n at 4-5.

On July 12, 2007, plaintiff filed a charge of discrimination with the EEOC. Mem. in Supp. of Mot. to Dismiss [Dkt. #7-1] ("Defs.' First Mem."), Ex. A (Charge of Discrimination, No. 570-2007-00866 dated July 12, 2007). According to the charge, plaintiff alleged that CNMC discriminated against her on the basis of her race and in retaliation for prior EEO activity between January 3, 2007 and March 13, 2007. *Id.*, Ex. A. CNMC allegedly was responsible for "Race-Based and Retaliatory Discrimination; Retaliation; Harassment; Intentional Infliction Of Emotional Distress; Hostile Work Environment; Adverse/Tangible Employment Actions (Heightened Scrutiny, Disparate Treatment, Decreased Responsibilities, Reprimand, Negative

Evaluation, Demotion, Discharge); Pretextual Argument For My Termination; Constructive

Termination; Actual termination (by way of the pretextual RIF[]).” *Id.*, Attach. at 2.[3]  The EEOC

was “unable to conclude that the information obtained [during its investigation] establishes

violations” of the applicable employment discrimination statutes.  Compl., Ex. A (Dismissal and

Notice of Rights dated September 23, 2009).

        Plaintiff brings this action under Title VII of the Civil Rights Act of 1964 (“Title

VII”), as amended, *see* 42 U.S.C. § 2000e *et seq.*, under 42 U.S.C. § 1981 (“Section 1981”), and

under the District of Columbia Human Rights Act (“DCHRA”), *see* D.C. Code § 1-1402.01 *et*

*seq.*  In addition, she brings common law claims of defamation, negligence, intentional infliction

of emotional distress (“IIED”), and wrongful termination in violation of public policy.  Plaintiff

demands that any reference to her suspension and final written notice be expunged from her

personnel file, that each defendant send plaintiff a letter of apology, and that a letter of reprimand

be placed in each individual defendant’s personnel file.  She also demands unspecified

compensation for past and future economic and non-economic losses.

## II.  DISCUSSION

### A.  *Dismissal Under Rule 12(b)(6) of the Federal Rules of Civil Procedure*

        The Federal Rules of Civil Procedure require that a complaint contain “‘a short

and plain statement of the claim showing that the pleader is entitled to relief,’ in order to ‘give

the defendant fair notice of what the . . . claim is and the grounds upon which it rests.’” *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957));

---

[3]      Plaintiff attached to her EEOC complaint a four-page typewritten document called
“Complaint-Particulars.”

*accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). Rule 12(b)(6) tests the legal

sufficiency of a complaint. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "To

survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.

Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. at 570. A complaint must be

dismissed under Rule 12(b)(6) if it consists only of "[t]hreadbare recitals of the elements of a

cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 129 S. Ct. at 1949.

On a Rule 12(b)(6) motion, the Court treats the factual allegations of a plaintiff's

complaint as if they were true, and draws all reasonable inferences stemming from such factual

allegations in the plaintiff's favor. *See Erickson v. Pardus*, 551 U.S. at 94; *Maljack Prods., Inc.

v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995). While the complaint is

to be "construed liberally in the [plaintiff's] favor," the Court "need not accept inferences drawn

by plaintiff[] if such inferences are unsupported by the facts set out in the complaint." *Kowal v.

MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *see also Bell Atl. Corp. v. Twombly*,

550 U.S. at 555 (stating that a court is "not bound to accept as true a legal conclusion couched as

a factual allegation"). Although "[a] *pro se* complaint . . . 'must be held to less stringent

standards than formal pleadings by lawyers,'" *Atherton v. D.C. Office of the Mayor*, 567 F.3d

672, 681 (D.C. Cir. 2009) (quoting *Erickson v. Pardus*, 551 U.S. at 94), *cert. denied*, 130 S. Ct.

2064 (2010), "a *pro se* complainant must plead 'factual matter' that permits the court to infer

'more than the mere possibility of misconduct.'" *Id.* at 681-82 (quoting *Ashcroft v. Iqbal*, 129 S.

Ct. at 1950).

## B. Discrimination Based on Race

### 1. Title VII

Under Title VII, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race[.]" 42 U.S.C. § 2000e-2(a)(1). Nor may an employer discriminate against an employee who has opposed an unlawful employment practice by making a charge, testifying, assisting or participating in an investigation or proceeding arising from a violation of Title VII. *See* 42 U.S.C. § 2000e-3(a). This language identifies "two elements for an employment discrimination case: (I) the plaintiff suffered an adverse employment action (ii) because of [her] race" or prior protected activity. *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).

Defendants represent that the complaint "goes on for pages concerning the alleged harassing and retaliatory conduct [plaintiff] claims she experienced," Defs. Children's Nat'l Med. Ctr. and Kathryn Kopenick's Mem. in Supp. of Mot. to Dismiss ("Defs.' Second Mem.") [Dkt. # 12-1] at 7, focusing on "her purported unfair treatment after . . . Singh became director of her department in January 2007." *Id*. at 7-8. Yet, defendants continue, plaintiff's "allegations of racial discrimination and retaliation are belied by her own factual assertions," *id.* at 8, principally those which "tie the alleged disciplinary action and purported hostile conduct . . . to her prior relationship with the former department head," *id.*, her refusal to participate in a scheme to appoint the new Director of the NRC, *id.*, and retribution for supporting Dr. Ball. *Id.* at 9.

Defendants' reading of the complaint is overly narrow and appears to ignore plaintiff's awkward but perceptible efforts to tie defendants' adverse employment actions to her race. For example, plaintiff alleges that she, "an African-American employee of . . . CNMC, was treated in a manner different from her similarly situated coworkers, and was subjected to . . . CNMC's altering the terms and conditions of her employment." Compl. at 15. She also alleges that the RIF was a pretext for discrimination against her and other African American employees. *Id.*; *see id.* at 17-19, 30. And with her assertion that "the disciplinary actions taken against her and the termination of her employment from CNMC . . . [were] directly related to her prior protected activity," Compl. at 37; *see id.* at 25, 33, plaintiff manages to allege a claim of retaliation in violation of Title VII. It matters not that plaintiff failed to "specifically mention race-based discrimination until many pages into her Complaint." Pl.'s Mem. in Opp'n to Defs. Children's Nat'l Med. Ctr.'s and Kathryn Koepenick's Mot. to Dismiss [Dkt. #14] ("Pl.'s Second Opp'n") at 21.

As the Court construes the complaint, plaintiff alleges that defendants both discriminated against her on the basis of her race and retaliated against her by suspending her, by issuing a Final Written Notice, and by terminating her through a pretextual RIF. The complaint is not a model of clarity; it is rambling, disorganized and repetitive. But it is also prepared by a *pro se* plaintiff and its allegations must be construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Atherton v. D.C. Office of the Mayor*, 567 F.3d at 681. Notwithstanding the imprecise and inartful drafting, plaintiff's complaint goes beyond mere conclusory statements and sets forth specific factual allegations that tend to support her causes of action. In other

words, the complaint does not "stop[] short of the line between possibility and plausibility of entitlement to relief."  *Ashcroft v. Iqbal*, 129 S. Ct. at 1949.

Moreover, plaintiff's obligation at the pleading stage is to put defendants on notice of the claims against them and the bases on which they rest.  Plaintiff accomplishes this task; she need not plead all the facts she ultimately must prove in order to prevail on the merits.  *See Atchison v. District of Columbia*, 73 F.3d 418, 421-22 (D.C. Cir. 1996); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) ("This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.").  Treating plaintiff's factual allegations as if they were true, and drawing all reasonable inferences stemming from such factual allegations in her favor, the Court concludes that plaintiff adequately states a claim of discrimination based on race and a claim for retaliation under Title VII.  *See, e.g., Winston v. Clough*, No. 07-1411, 2010 WL 1875626, at *8 (D.D.C. May 11, 2010); *Kornegay v. AT&T*, No. 05-0001, 2006 WL 825622, at *3 (D.D.C. Mar. 29, 2006) ("In other words, plaintiff claims that he was a qualified employee terminated under false pretenses because of his race [or protected activity] and therefore he need not plead all the elements of a Title VII race discrimination [or retaliation] claim in order to state a claim.")  (brackets omitted).

The next question is who may properly be sued under Title VII.  An employer is defined under Title VII as "a person engaged in an industry affecting commerce who has fifteen or more employees . . .  and any agent of such a person."  42 U.S.C. § 2000e(b).  Ostensibly, then, a complainant's supervisors or co-workers may be considered the agents of an employer.  But the District of Columbia Circuit has rejected the notion that such individuals may be held personally

liable under Title VII. "[W]hile a supervisory employee may be joined as a party defendant in a Title VII action, that employee must be viewed as being sued in his capacity as the agent of the employer, who is alone liable for a violation of Title VII." *Gary v. Long*, 59 F.3d 1391, 1393 (D.C. Cir. 1995) (citing *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991)), *cert. denied*, 516 U.S. 1011 (1995). To the extent that plaintiff joins Singh, Morrison-Quintana, Hulbert and Koepenick as defendants to her Title VII claims because of their status as agents of the employer, these claims "essentially merge[] with her claim against [CNMC]." *Id.* Plaintiff's Title VII claims against Singh, Morrison-Quintana, Hulbert and Koepenick in their individual capacities therefore must be dismissed. *See, e.g., Laurent v. Bureau of Rehab., Inc.*, 544 F. Supp. 2d 17, 25 (D.D.C. 2008) (granting summary judgment for the individual defendants who may be sued in their official capacities, not their individual capacities, under Title VII); *Isse v. Am. Univ.*, 540 F. Supp. 2d 9, 27 (D.D.C. 2008) (dismissing Title VII claim against plaintiff's immediate supervisor); *McMillan v. District of Columbia*, 466 F. Supp. 2d 219, 223 (D.D.C. 2006) (dismissing Title VII claim against acting department chief in his individual capacity).

## 2. Section 1981

Section 1981 of Title 42 of the United States Code provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute further "prohibits racial discrimination in the 'making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.'" *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 17-18 (D.D.C. 2009)

(quoting 42 U.S.C. § 1981(b)).  It is established that such contracts include employment

contracts.  *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975).  To state a claim

under Section 1981, a plaintiff  "must identify an impaired 'contractual relationship' . . . under

which [she] has rights," *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006), and she

must allege "some facts that demonstrate that race was the reason for the defendant's actions."

*Bray v. RHT, Inc.*, 748 F. Supp. 3, 5 (D.D.C. 1990).

      Defendants argue that, because the complaint fails to allege discrimination based

on race, it therefore fails to allege a Section 1981 claim.  "Rather, [p]laintiff specifically alleges

that the conduct about which she complains stemmed from a power struggle within her

department and her support of the outgoing Executive Director."  Defs.' Second Mem. at 9; *see*

Defs.' First Mem. at 7.  For the same reasons that the Court has concluded that the factual

allegations of plaintiff's complaint support her Title VII claim, these same allegations necessarily

support her Section 1981 claim of discrimination based on race.

      Because the complaint includes no express allegations as to the existence of a

formal, written contract or employment agreement between plaintiff and CNMC, the Court

presumes that plaintiff was an at-will employee of CNMC.  *Carl v. Children's Hosp.*, 702 A.2d

159, 162 (D.C. 1997) (Terry, J., concurring) ("This court has long and consistently adhered to the

rule that employment is presumed to be at will, unless the contract of employment expressly

provides otherwise.").  It is established that an at-will employee may maintain an action under

Section 1981.  *See Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F. Supp. 2d 27, 32

(D.D.C. 1999) (holding that Section 1981 covers at-will employment agreements because

"District of Columbia law . . . treat[s] at-will agreements as contracts").

An employment discrimination claim brought under Section 1981 "mirrors, in most ways, an employment discrimination claim brought pursuant to Title VII . . . . [But] [u]nlike Title VII, individual liability can be imposed for personal involvement in discriminatory activity that violates Section 1981." *Zaidi v. Amerada Hess Corp.*, 723 F. Supp. 2d 506, 516-17 (E.D.N.Y. 2010) (citations omitted). Moreover, "[i]ndividuals with supervisory authority . . . may be held liable under [Section] 1981." *Tnaib v. Document Technologies, LLC*, 450 F. Supp. 2d 87, 92 (D.D.C. 2006) (citing cases); *see also Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F. Supp. 2d at 33 (finding that individual supervisors can be sued under Section 1981 and denying their motion to dismiss); *see Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp. 2d 1334 (S.D. Ala. 2010) (noting that "a claim for individual liability under [Section] 1981 requires an affirmative showing linking the individual defendant with the discriminatory action."). Therefore, under District of Columbia law, an at-will employee alleging discrimination based on race may bring a Section 1981 claim not only against her employer but also against those supervisors who take actions in violation of Section 1981. At this stage of the proceedings and on the current record, the complaint sufficiently alleges a Section 1981 claim against all defendants. Their motions to dismiss the Section 1981 claim will be denied without prejudice.

### 3.  District of Columbia Human Rights Act

Under the DCHRA, it is unlawful for an employer "[t]o fail or refuse to hire, or to discharge, any individual[,] or otherwise to discriminate against any individual, with respect to [her] compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any

individual of employment opportunities, or otherwise adversely affect [her] status as an employee" on the basis of her race. D.C. Code § 2-1402.11(a)(1). The term "employer" means "any person who, for compensation, employs an individual," as well as "any person acting in the interest of such employer, directly or indirectly." D.C. Code § 2-1401.02(10). An individual therefore may be held liable personally under the DCHRA if she is acting on behalf of an employer. *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 888 (D.C. 1998) (finding that the DCHRA applies to individual partners of law firm because the partners acted in the interest of the employer, a law partnership); *see Zelaya v. UNICCO Serv. Co.*, 587 F. Supp. 2d 277, 284-85 (D.D.C. 2008) (concluding that plaintiff's former supervisor can be individually liable under the DCHRA); *Alston v. District of Columbia*, 561 F. Supp. 2d 29, 44-45 (D.D.C. 2008) (allowing claim under D.C. Code § 2-1402.41 for discrimination based on disability to proceed as against agents of the District of Columbia Public Schools, an educational institution covered by the DCHRA); *MacIntosh v. Bldg. Owners and Managers Ass'n Int'l*. 355 F. Supp. 2d 223, 227-28 (D.D.C. 2005) (citing *Wallace*, denying motion of association's Executive Director and a Vice President to dismiss DCHRA claims against them in their individual capacities).

"The limitation period for a civil action brought pursuant to the [DCHRA] is one year." *Jones v. Howard Univ.*, 574 A.2d 1343, 1345 (D.C. 1990) (citing *Davis v. Potomac Elec. Power Co.*, 449 A.2d 278, 280-81 (D.C. 1982)). "When a charge of discrimination is filed with the EEOC in the District of Columbia, a claim is automatically cross-filed with the D.C. Office of Human Rights ('DCOHR') pursuant to a 'worksharing agreement' between the two agencies." *Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp. 2d 71, 78 (D.D.C. 2009); *Ware v. Nicklin Assocs., Inc.*, 580 F. Supp. 2d 158, 164 (D.D.C. 2008) (citing *Estenos v. PAHO/WHO Fed. Credit Union*,

952 A.2d 878 (D.C. 2008)); *see* 29 C.F.R. § 1601.13(a)(4)(ii)(A). The timely filing of a complaint with the DCOHR "toll[s] the running of the statute of limitations while the complaint is pending," D.C. Code § 2-1403.16(a), and "the timely filing of a charge with the EEOC, and the automatic cross-filing of a claim with the DCOHR that follows, is sufficient to toll the one-year statute of limitations for filing a claim under the DCHRA." *Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp. 2d at 78 (citations omitted). When plaintiff filed her complaint with the EEOC, she named CNMC as the entity believed to have discriminated against her. The one-year limitations period therefore was tolled as to CNMC.

Defendants Singh, Morrison-Quintana, Hulbert and Koepenick were not named as respondents by plaintiff in her EEOC complaint. They move to dismiss plaintiff's DCHRA claims as untimely – she filed her lawsuit in December 2009, "more than 2 ½ years after the last possible date that the purported discrimination or retaliation could have occurred." Defs.' First Mem. at 9.[4] Plaintiff counters that she timely filed her charge of discrimination with the EEOC, and by doing so she "automatically co-filed" with the DCOHR. Pl.'s First Opp'n at 8; Pl.'s Second Opp'n at 7-8. But plaintiff's charge of discrimination did not name the individual defendants as the parties responsible for the discrimination and retaliation she suffered. Plaintiff cannot now proceed as against the individual defendants on DCHRA claims that were neither brought within the one-year statute of limitations nor filed with the EEOC or the DCOHR. The Court will dismiss without prejudice plaintiff's DCHRA claims against defendants Singh, Morrison-Quintana, Hulbert and Koepenick; these claims may proceed as against CNMC only.

---

[4] Although defendant Koepenick does not move for dismissal of plaintiff's DCHRA claims on this ground, the others' argument applies equally to her.

## C. Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress consists of "(1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) cause[d] the plaintiff severe emotional distress." *Halcomb v. Woods*, 610 F. Supp. 2d 77, 80 (D.D.C. 2009) (citing *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002)); *see also The Cuneo Law Group, P.C. v. Joseph*, 669 F. Supp. 2d 99, 121 (D.D.C. 2009); *Evans v. District of Columbia*, 391 F. Supp. 2d 160, 170 (D.D.C. 2005). "To establish the required degree of outrageousness [to sustain an IIED claim], the plaintiff must allege conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kerrigan v. Britches of Georgetowne*, 705 A.2d 624, 628 (D.C. 1997) (internal citations and quotation marks omitted). This "very demanding standard" is "only infrequently met." *Dale v. Thomason*, 962 F. Supp. 181, 184 (D.D.C. 1997). "Especially in the employment context, the standard is exacting." *Evans v. District of Columbia*, 391 F. Supp. 2d at 170. "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" cannot support an IIED claim, *Halcomb v. Woods*, 610 F. Supp. 2d at 80 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)), and termination is not conduct so extreme and outrageous that it exceeds the bounds of decency. *See Brown v. Sim*, No. 03-2655, 2005 WL 3276190, at *4 (D.D.C. Sept. 30, 2005); *Elliott v. Healthcare Corp.*, 629 A.2d 6, 9 (D.C. 1993); *see also Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 211-12 (D.C. 1997) ( "[G]enerally, employer-employee conflicts do not rise to the level of outrageous conduct.").

Plaintiff's complaint includes a section titled "Intentional Infliction of Emotional Distress," *see* Compl. at 28-31, in which she describes how her co-workers "were watching [her] movements" in order to determine whether her behavior or demeanor violated the terms of the Final Written Notice, such that she "arrived at work each day expecting to be fired." *Id.* at 28. Defendants move to dismiss the IIED claim because the complaint alleges neither severe emotional distress on plaintiff's part nor conduct rising to the level of outrageousness necessary to sustain an IIED claim. Defs.' First Mem. at 9-11; Defs.' Second Mem. at 10-12.

That plaintiff "was under a great deal of intentional pressure," Compl. at 29, does not adequately allege that she suffered severe emotional distress. Neither the scrutiny she endured nor the prospect of immediate termination for a violation of the terms of the Final Written Notice comprises conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991). The Court concludes that the complaint fails to state an IIED claim. The claim therefore will be dismissed as against all defendants. *See Darrow v. Dillingham & Murphy, LLP*, 902 A.2d 135, 139 (D.C. 2006) (allegations that office manager was stripped of her duties, blocked from access to billing software, and employer's placement of an advertisement for a new office manager did not state an IIED claim); *Crowley v. N. Am. Telecomm. Ass'n*, 691 A.2d 1169, 1172 (D.C. 1997) (allegations that employee "was subjected to contempt, scorn and other indignities in the workplace by his supervisor and an unwarranted evaluation and discharge" fail to state an IIED claim); *Elliott v. Healthcare Corp.*, 629 A.2d at 9 (employee's discharge was not extreme and outrageous as a matter of law).

## D. Negligence

The basic elements of a negligence claim are that defendant owes plaintiff a duty of care, defendant breached this duty and thereby caused plaintiff harm. *See, e.g., District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C. 2001). Defendants argue that the complaint fails to state a negligence claim against them because it lacks allegations regarding a duty of care owed to plaintiff. Defs.' First Mem. at 12; Defs.' Second Mem. at 13. Plaintiff counters that Singh "owed at minimum[] a duty of fair treatment to [p]laintiff, Pl.'s First Opp'n at 16, as did Koepenick. Pl.'s Second Opp'n at 23. Plaintiff does not articulate what this duty entails, and instead appears to allege that, if there was negligence at all, the actual negligent party was CNMC. *See* Compl. at 35-36.

Insofar as the conduct giving rise to plaintiff's negligence claims is the same conduct giving rise to her Title VII claims, the negligence claims appear to be duplicative. Accordingly, the Court will dismiss the negligence claims without prejudice. *See Wade v. Washington Metro. Area Transit Auth.*, No. 01-0334, 2005 WL 1513137, at *6 (D.D.C. June 27, 2005) (finding that negligence claim arising from defendant's alleged failure to assure that company's "sexual harassment policies were not violated, and more specifically, to assure that [p]laintiff was not subjected to a hostile work environment . . . is preempted by Title VII as the injury arises out of the alleged harassment itself"); *Crosten v. Kamauf*, 932 F. Supp. 676, 684 (D. Md. 1996) (dismissing common law negligence claims "to impose liability on [the employer] for its alleged failure to conform to the dictates of Title VII in its efforts to prevent sexual harassment, or to properly respond to a report of sexual harassment" because they "merely restate the claim brought under Title VII").

*E. Wrongful Termination in Violation of Public Policy*

As noted earlier, the Court presumes that plaintiff is an at-will employee. An employer may discharge an at-will employee "at any time and for any reason, or for no reason at all." *Holman v. Williams*, 436 F. Supp. 2d 68, 76 (D.D.C. 2006) (quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991) (citations omitted)). Under District of Columbia law, however, "wrongful termination in violation of a clear public policy is an exception to the traditional at-will employment doctrine." *Bowie v. Gonzales*, 433 F. Supp. 2d 24, 30 (D.D.C. 2006) (citing *District of Columbia v. Beretta, U.S.A. Corp.*, 872 A.2d 633, 645 (D.C. 2005)). "Whether a discharge violates public policy is determined on a case-by-case basis, guided by the concept that a wrongful termination cause of action must be 'firmly anchored in the Constitution or in a statute or regulation which reflects the particular public policy being relied upon.'" *Id.* (quoting *Warren v. Coastal Int'l Secs., Inc.*, 96 Fed. Appx. 722, 722-23 (D.C. Cir. 2004)). For example, discharge of an employee who refused to violate a statute – that is, forcing the employee to choose between breaking the law and keeping her job – is considered a wrongful discharge in violation of public policy. *See Adams v. George W. Cochran & Co., Inc.*, 597 A.2d at 32, 34.

Defendants maintain that to successfully invoke this exception, plaintiff must point to a "fundamental public policy expressed in a statute, regulation, or constitution that supports her position that she was wrongly terminated," and she has failed to do so. Defs.' Second Mem. at 14; *see* Defs.' First Mem. at 13. Nor does plaintiff demonstrate a connection between a public policy and the conduct which brought about her termination. Defs.' First Mem.

at 13.  For plaintiff's failure "to state a viable wrongful termination claim against [d]efendants, . . . such claims must be dismissed."  Defs.' Second Mem. at 14.

Defendants are correct that the public policy exception to the at-will doctrine must be "solidly based on a statute or regulation that reflects the public policy to be applied or (if appropriate) on a constitutional provision concretely applicable to the defendant's conduct." *Holman v. Williams*, 436 F. Supp. 2d at 76 (quoting *Carl v. Children's Hosp.*, 702 A.2d at 163 (Terry, J., concurring)); *see also Riggs v. Home Builders Inst.*, 203 F. Supp. 2d 1, 17 (D.D.C. 2002).  Review of the complaint in this case reveals that the only policies allegedly violated were CNMC's internal personnel policies regarding employee discipline, grievances, equal employment opportunity, harassment, and retaliation.  Plaintiff identifies no public policy the violation of which contravenes public policy, and therefore the complaint fails to state a wrongful termination claim.  *See Davis v. Gables Residential/H.G. Smithy*, 525 F. Supp. 2d 87, 102 (D.D.C. 2007) (dismissing wrongful discharge claim "in the absence of any identified public policy" or, alternatively, absent a showing of a "'close fit' between the policy and [plaintiff's] conduct"); *Bowie v. Gonzales*, 433 F. Supp. 2d at 31 (concluding that, while "attempts to strong-arm plaintiff into supporting [an employee's] dismissal are not admirable actions, they do not rise to the level necessary for a public policy violation supporting an exception to at-will employment doctrine in a wrongful termination claim").

## F.  Defamation

Plaintiff's defamation claims arise principally from the comments Morrison-Quintana allegedly made with respect to plaintiff's performance and behavior issues occurring

prior to January 2007, *see* Compl. at 31-35, leading to plaintiff's suspension and the issuance of the Final Written Notice, *see id.* at 33. It appears, however, that plaintiff intends to bring defamation claims against all defendants. *See id.* at 34.

Under District of Columbia law, "the right to maintain [an] action accrues . . . for libel [and] slander" in one year. D.C. Code §12-301(4); *see Maupin v. Haylock*, 931 A.2d 1039, 1042 (D.C. 2007); *Oparaugo v. Watts*, 884 A.2d 63, 72 (D.C. 2005). Defendants argue that plaintiff's defamation claims are time-barred, as all of the events giving rise to her defamation claim arose either before January 3, 2007, or not later than her post-termination exit interview on March 13, 2007. *See* Defs.' First Mem. at 11; Defs.' Second Mem. at 12. Plaintiff counters that her defamation claims are timely for the same reasons that her DCHRA claims are timely. *See* Pl.'s Second Opp'n at 23. "Even though the EEOC does not investigate claims of defamation, those claims would fall under the DCHRA," and the statute of limitations is tolled while the EEOC completes its investigation. *Id.*

Defamation is not an unlawful discriminatory practice under the DCHRA, and plaintiff offers no alternative argument for the tolling of the one-year statute of limitations. Her defamation claims, then, will be dismissed without prejudice as untimely. *See DiLella v. Univ. of the District of Columbia David A. Clark Sch. of Law*, 570 F. Supp. 2d 1, 11 (D.D.C. 2008) (dismissing defamation claim filed 13 months after it had accrued); *Nevius v. Africa Inland Mission Int'l*, 511 F. Supp. 2d 114, 121 (D.D.C. 2007) (dismissing defamation claim filed nearly seven months after statute of limitations had run).

### G. *Appointment of Counsel from the Civil Pro Bono Panel*

The Court's ruling on defendants' dispositive motions resolves some, but not all, of the legal claims plaintiff raises. On the assumption that this case will proceed to discovery, the Court considers, *sua sponte*, whether counsel should be appointed to represent this plaintiff.

"The law is well established that there is no constitutional right to appointment of counsel in a civil case," *Cookish v. Cunningham*, 787 F.2d 1, 2 (1st Cir. 1986) (per curiam) (citations omitted), and no indigent civil litigant is guaranteed counsel. *Willis v. Fed. Bureau of Investigation*, 274 F.3d 531, 532 (D.C. Cir. 2001). The Court has the discretion, however, to appoint counsel to represent an indigent *pro se* party under 28 U.S.C. § 1915(e)(1). Pursuant to this authority, Local Civil Rule 83.11 provides:

> When leave has been granted pursuant to 28 U.S.C. § 1915 for a *pro se* litigant to proceed *in forma pauperis*, the judge to whom the case is assigned may, on application by the *pro se* party or otherwise, appoint an attorney from the Panel to represent such party. The appointment should be made taking into account:
>
> (I) the nature and complexity of the action;
> (ii) the potential merit of the *pro se* party's claims;
> (iii) the demonstrated inability of the *pro se* party to retain counsel by other means; and
> (iv) the degree to which the interests of justice will be served by appointment of counsel, including the benefit the Court may derive from the assistance of the appointed counsel.

LCvR 83.11(b)(3); *see Willis v. Fed. Bureau of Investigation*, 274 F.3d at 532 (affirming application of the factors set forth in the former LCvR 83.11(a)(4)(B) to decide a motion for the appointment of counsel in a civil action brought under the Freedom of Information Act). The Court has considered these factors and determines that appointment of counsel is warranted at this time. All proceedings will be stayed pending entry of counsel's appearance.

### III.  CONCLUSION

For the reasons discussed above, plaintiff's Title VII and DCHRA claims against defendants Singh, Morrison-Quintana, Hulbert and Koepenick in their individual capacities will be dismissed.  Because the complaint fails to state claims of intentional infliction of emotional distress and wrongful termination in violation of public policy, these claims will be dismissed as against all defendants.  Plaintiff's defamation claims as against all defendants will be dismissed as untimely, and her negligence claims will be dismissed as duplicative of those brought against CNMC under Title VII.  Remaining, then, are plaintiff's Title VII and the DCHRA claims against CNMC, and her Section 1981 claims against all defendants.  An appropriate Order accompanies this Opinion.


/s/_____
PAUL L. FRIEDMAN
DATE:  March 30, 2011            United States District Judge